Wagoner County, Oklahoma
Filed
in District Court

OCT 03 2025

James E. Hight
Court Clerk
At_________o'clock_____ M

**IN THE DISTRICT COURT OF WAGONER COUNTY**
**STATE OF OKLAHOMA**

**CHRISTINA MERRELL,**

*Plaintiff,*

**v.**

**STATE FARM FIRE AND CASUALTY COMPANY**

and

**JASON STRICKLAND,**

*Defendants.*

**CASE NO.** CJ-25-416

# PETITION

**EXHIBIT 1**

## I. INTRODUCTION

1. This Petition alleges a systematic and pervasive Scheme on the part of Defendants (a) State Farm Fire and Casualty Company ("State Farm") and (b) State Farm's captive agent Jason Strickland ("Agent").[1] By and through their Scheme, Defendants have caused substantial harm to Plaintiff.

2. The Petition's **<u>Scheme allegations</u>** here resemble those in other Petitions against State Farm; simply, Defendants have subjected Plaintiff to the same Scheme impacting numerous other State Farm insureds. Indeed, State Farm has subjected policyholders uniformly (both in Oklahoma and in other storm-prone states) to its Scheme by and through the material assistance of its captive Agents. There are subtle differences across each such Petition—*e.g.*, the date of loss, the agent and adjusters furthering the Scheme, and the specific tactics State Farm used in each instance to deny the claim or force its payment under the policy deductible amount. These are described in particular detail. But the core misconduct at issue remains materially identical in each instance. State Farm routinely assails these similarities as indicia of fraud. But as the Honorable Judge Palk, Western District of Oklahoma, recently held

> the fact that Plaintiffs' claims are premised on the existence of a widespread scheme by State Farm ***dispels*** that the use of a formulaic petition, in and of itself, demonstrates actual fraud.

*Willard v. State Farm Fire & Cas. Co.*, 2025 WL 2419274, at *15 (W.D. Okla. Aug. 21, 2025) (Palk, D.J.). And as Plaintiff demonstrate here, "each of the petitions include ***<u>unique</u>***

[1] This Petition refers to State Farm and Agent collectively as "Defendants."

***factual allegations*** demonstrating the specific alleged harm suffered by each plaintiff." *Id.* Thus, State Farm's attacks on the "cookie-cutter" or "form" nature of the numerous complaints filed against it based on its Scheme (arguments State Farm routinely recycles while ignoring the particular **fact allegations** of each petition) are meritless. *See Pruitt v. State Farm Fire & Cas. Co.*, 2025 WL 1030353, at *4 (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.) ("As State Farm is likely aware, several judges in this district have found that allegations of cookie-cutter complaints are, alone, insufficient to establish fraudulent joinder.") (citing *Norman v. State Farm Fire & Cas. Co.*, 2025 WL 342871, at *4 (W.D. Okla. Jan. 30, 2025) (Russell, D.J.). In *Willard*, Judge Palk recognized the common questions of law and fact involved in the eleven State Farm cases before him, ordered that all eleven cases be consolidated, granted remand in all eleven cases, and directed that each case be remanded to the appropriate State of Oklahoma District Court. *See Willard*, 2025 WL 2419274, at *4-7.

3. ***"Like a good neighbor, State Farm is there"***—a ubiquitous and recognizable slogan designed to lure insureds into reliance upon its duty of good faith and promises of comprehensive indemnity. But despite its hollow "good neighbor" promises, State Farm employs a systematic and pervasive Scheme throughout Oklahoma, whereby it wrongfully denies its insureds' claims for damage to their covered property caused by wind and/or hail. At all relevant times, State Farm's Scheme is carried out in substantial and material part by its captive agents (like Agent), who are aware of the Scheme, understand its impact on State Farm insureds (like Plaintiff), and even benefit from the payment reduction the Scheme is designed to achieve. The Scheme is a product of State Farms'

**Wind/Hail Focus Initiative** (described below) and was engineered by State Farm to accomplish the goals set forth by its Wind/Hail Focus Initiative: the reduction of its indemnity losses on roof replacements. State Farm's denials of wind and hailstorm claims pursuant to the Scheme are unreasonable, lack true justification, and are pre-determined. State Farm and its agents (including Agent) employ the Scheme intentionally, knowingly, and purposefully for profit. They do so in bad faith.

4. Defendants' wind and hailstorm scheme (the "Scheme") operates as follows:

a. State Farm's captive agents (including Agent) market, sell, procure, and bind (whether upon inception and/or at renewal)[2] State Farm **full replacement cost insurance coverage** to the insured at the insured's behest to cover the insured's home. In doing so, State Farm's agent (like Agent here) expressly and/or impliedly represents (i) the property to be insured meets State Farm's **underwriting rules, guidelines, and requirements** for the full replacement cost coverage purportedly bound, and (ii) the replacement cost value (and resultant full replacement cost coverage limit) State Farm's agent calculated for the insured is an accurate reflection of (at least) 100% of the property's insured value—that is, all components of the insured property are fully covered.

b. The agent can only make these representations in good faith—with the requisite care, skill, and diligence required of the agent under Oklahoma law—

---

[2] Under Oklahoma law, each annual issuance of the policy at issue involves each of these acts, whether it be the inception of full replacement cost coverage in the first instance or the subsequent renewal thereof. Therefore, even an agent who renews full replacement cost coverage initially procured by another agent engages in these acts.

if the agent verifies the quality and condition of the property to be insured. While this would require the agent's physical inspection of the property to verify its condition, this inspection practically never occurs. Nevertheless, State Farm's agents market, sell, procure, and bind State Farm full replacement cost coverage (just as Agent did for Plaintiff) nonetheless. While these acts inherently represent to the insured in each instance that the property in question qualifies for the insurance to be bound and meets the underwriting guidelines governing State Farm full replacement cost coverage, in almost every instance of the Scheme, the agent lacks all practical bases to make such an inherent representation in good faith. Here, Agent lacked all reasonable bases to represent to Plaintiff the Insured Property fully qualified for "full replacement cost coverage."

c. Nevertheless, and almost always without verification, the captive agent effectively certifies to State Farm ***and to the insured*** that the property in question meets State Farm's underwriting guidelines, criteria, and rules despite having no reasonable basis to do so and without knowing if the same is actually true. Here, Agent bound Plaintiff's Policy without such a reasonable basis and/or knowledge.

d. All the while, State Farm's captive agents (like Agent) are aware of the Scheme. They are aware of the practical improbability that State Farm will pay a roof claim by the insured. They are aware that, pursuant to the Scheme, State Farm will drum up a justification for outright denial of the claim or for depressing the

payment to an amount under the deductible. In fact, State Farm provides training to its captive agency personnel on key aspects of the Scheme.

e. State Farm's captive agents (like Agent) are aware State Farm achieves the goals of the Wind/Hail Focus Initiative and the resultant Scheme through an array of bad faith tactics. These include State Farm's use of an undisclosed, narrow, and limited definition of what constitutes covered hail damage. This secret coverage limitation, which is derivative of the Wind/Hail Focus Initiative and inherent to the Scheme, is ***wholly absent from the insured's policy*** and never otherwise disclosed to the insured. That is, the policy does not specifically define or limit when hail damage is covered under the policy, even though State Farm defines and limits the same internally for the purposes of claims handling. State Farm uses this definition to dictate whether an insured is entitled to payment under the policy upon the filing of a valid wind and/or hailstorm claim, yet it never discloses it to insureds. State Farm agents further the Scheme by refusing to disclose this material, narrow, and limited definition of hail damage when marketing, selling, procuring, and/or binding State Farm full replacement cost coverage—even though the limitation effectively undermines the "full replacement cost" nature of the coverage the insured believed they purchased.

f. Further, State Farm agents (like Agent) are aware of (and fail to disclose) other bad faith claims handling tactics inherent to State Farm's Scheme. These tactics are material to an insured when purchasing an insurance policy; they include State Farm's pre-ordained attribution of covered damage to roofs to some

non-covered cause (*e.g.*, wear and tear, granular loss, deterioration, or defect). These non-covered causes, when actually present, either plague the roof from its installation or accrue progressively over time. For example, wear and tear does not accrue instantaneously. That is, when truly present, these defects should almost always be identifiable at the most recent renewal of the policy—a new contract through with the Agent and State Farm again represent the home to fully quality for coverage. So, if actually present, these defects should warrant some reduction in the coverage written on the home and its relative insurance-to-value OR the home remains fully insured despite them.

g. Further, State Farm agents (like Agent) are aware of (and fail to disclose) the ways State Farm adjusters further the Scheme. This includes drafting sham estimates blaming patent wind- and hail-storm damage to non-covered causes to avoid paying for roof replacements. In other instances, State Farm adjusters further the Scheme by manipulating the insured's date of loss to reflect dates on which no hail was detected in the area. State Farm's agents (like Agent) are fully aware of these bad faith tactics (*e.g.*, from repeated customer complaints and cross-agent back chatter), yet they fail to disclose this (and other) material information about State Farm's Scheme in violation of duties owed to the insured.

h. State Farm's agents (like Agent) are motivated to further the Scheme by carrot and stick. On information and belief, the carrot lies in State Farm's agents' compensation, which is based in some part on the ratio of losses deriving from policies the specific agent marketed, procured, sold, bound, and renewed. Thus, any

corporate initiative designed to improve that loss ratio—*e.g.*, State Farm's Wind/Hail Focus Initiative and the resultant Scheme to reduce roof spend—only serves to increase the captive agents' compensation. To this end, State Farm provides its captive agents (like Agent) comprehensive training in skillsets that help them advance the Scheme.

i. On the Agent's certification that the property meets State Farm's underwriting guidelines, State Farm issues a policy purporting to convey full replacement cost coverage for the insured's home. State Farm, through both the policy itself and its captive agents, expressly and/or impliedly represents the policy covers loss arising from a wind or hailstorm. The policy language does not define or otherwise limit wind or hail damage full replacement cost coverage outside the policy monetary full replacement cost coverage limits and the loss triggering clause: "accidental direct physical loss."

j. The insured incurs a covered loss to the insured property arising from wind, hail, and/or tornado and timely files a claim. Plaintiff here incurred such a loss and filed a claim.

k. State Farm then denies the claim as part of its Scheme. In each instance, State Farm does whatever it can to avoid replacing the roof. It does so using an array of bad faith tactics rigged against the insured. It denies the claim vis-a vis the roof either outright or, in many cases, by depressing the amount it agrees to pay below the policy deductible, thereby avoiding payment. In limited instances, it may pay for certain property damage that exceeds the deductible. But, in each

case, to minimize its payments, State Farm manipulates its damage estimate to ignore patent wind and or hail damage to the insured property, ostensibly blaming it on some non-covered cause of loss.

1. The Scheme is a byproduct of State Farm's Wind/Hail Focus Initiative—its internal investigation into its indemnity losses vis-à-vis wind and hail claims and the recommendations it developed to curb that spend. The Initiative set out to reduce State Farm's indemnity losses on wind and hailstorm claims—most critically, total roof replacements. Non-confidential documents in the public record, such as Exhibit 6 attached to the August 14, 2023 response pleading in CJ-2021-1741,[3] evidence the Scheme in action. A State Farm adjuster testified under oath to how the agent's determination of the condition of the roof at inception or renewal and subsequent denial for "wear and tear" or pre-existing damage are essential in State Farm's denial of full roof replacements. The captive agent is a critical player in the Scheme via its assessment of the property's conformity to State Farm's underwriting guidelines, inspection (or lack thereof) at policy inception and renewal, determination of eligibility for replacement cost, determination of the amount of such replacement cost, and the assessment of the condition of the roof and premises. The State Farm adjuster admitted under oath as follows:

> everyone on our team did not have any authority anymore to total roofs because <u>**we were paying for too many roof claims**</u> … when I was told that it is not hail or it's not new hail, to call it wear and tear to deny a claim, I felt – I felt bad … I

[3]Available at https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CJ-2021-1741&cmid=3968060 (last visited Sept. 22, 2025).

> legitimately felt like there was some damage from hail, from new hail that I felt that the roof should be totaled, that I was told to deny the whole thing, and that – that was difficult.

m. Discovery from State Farm filed in the public record reveals that State Farm captive agents are well aware of how hail claims are being adjusted. In Exhibit 6 to the June 14, 2023 pleading, a State Farm captive agent, David Hoffhines, sent the following email:

> I understand that you are not able to find hail on the date my insured has cell phone pics on? Can we discuss this please?? How do I tell my client that the hail damage marks that were uploaded to the file from contractor are invisible to claims reps and supervisors?? I know the growing trend is for SF to deny hail claims, I'm just curious how do I word this??

n. State Fam's Scheme is under national scrutiny. Recently, the Senate Homeland Security Committee held a hearing on the Insurance Industry's Natural Disaster Practices.[4] For example, Nick Schroeder, a former licensed adjuster for State Farm and Allstate, testified to bad faith claims handling practices nearly identical to Plaintiff's allegations here:

> More commonly, **these changes were simply excluding hail-damaged shingles due to age or wear**. In one case involving policyholders Susan and Dennis Carter, **<u>I was instructed to deny shingle damage as wear and tear despite visible hail impact marks consistent with adjacent dented metal</u>**. Although I provided a hail report confirming activity near the property on the reported date of loss, **<u>the claim was reassigned after I refused to amend the estimate to exclude hail damage</u>**.[5]

[4] *Available at* https://www.youtube.com/watch?v=Qs2VKoQPvxY (last visited Sept. 22, 2025).

[5] Examining the Insurance Industry's Claims Practices Following Recent Natural Disasters - Committee on Homeland Security & Governmental Affairs, *available at*

The wealth of evidence here, as well as what Plaintiff know will be revealed through discovery, establishes a sinister Scheme by State Farm to defraud insureds such as Plaintiff

o. When subjected to the Scheme, an insured has no choice but to file suit to recover benefits State Farm owes under the policy. To this end, part of State Farm's Scheme includes forcing insureds to hire counsel to obtain benefits rightly owed under the Policy. State Farm's treatment of Plaintiff (including bad faith claims handling tactics and material misrepresentations and/or omissions by State Farm and State Farm agents) exemplifies this Scheme in action, as the Petition sets forth in Section III, below.

p. State Farm has continually asserted a blanket disclaimer of its captive agents' underwriting duties and often states agents are not required to inform insureds about the condition of their home and adjust their coverage accordingly. However, State Farm's own underwriting reviews and similar underwriting documents have revealed that State farm captive agents are in fact tied to underwriting. State Farm captive agents regularly inform insureds about corrective measures required following roof damage to remain eligible for full replacement cost coverage—or else coverage will be reduced or even cancelled. For example, State Farm issued the following underwriting notice to one of its insureds and

---

https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/examining-the-insurance-industrys-claims-practices-following-recent-natural-disasters/ (last visited Sept. 22, 2025).

advised them of underwriting requirements that needed to be fulfilled to reduce the risk of additional damage to the roof. The notice instructs the insured to contact ***their State Farm agent*** regarding such requirements:

Important Notice

On behalf of State Farm, a representative from a survey company visited your home to obtain additional underwriting information. We believe there are positive measures that should be taken to reduce the risk for loss.

The following underwriting requirement(s) must be completed:

Replace all boarded, broken or cracked glass in doors and/or windows to reduce the risk of injury or property damage.

To reduce the risk of property and liability losses, regularly maintain the exterior of the property. Particular attention needs to be given to the removal of:

- miscellaneous personal property.

To reduce the risk of additional damage to the roof and/or interior water damage, the roof on the dwelling must be replaced as evidenced by the deteriorated shingles with granule loss. Have a roofing contractor complete the work.

Eligible roofing material must be used when roof covering is being replaced. Consult with your agent for additional information on eligible roof types.

The outlined requirement(s) present(s) an increase in hazard. Your cooperation with the above underwriting requirement(s) is appreciated. Please provide your agent documentation confirming the underwriting requirement(s) outlined above has been met. This policy will be set to non-renew effective October 21, 2025, unless verification is received.

NOTE: The requirement(s) is made solely to help reduce the potential for future losses insured under your policy. However, it is not a guarantee against future losses. Any costs associated with the requirements outlined in this letter will be at your expense.

If you have any questions regarding the requirement(s) or the timeline for completion, contact State Farm Agent Carla Holzrichter at (918) 367-5547. [6]

[6] May 23, 2025 Notice to State Farm insureds Josh & Tara Mattox.

Moreover, State Farm issued a similar notice to an insured showing that State Farm captive agents are required to inform insureds of the condition of the home and make the appropriate adjustments to the insurance coverage:

> IMPORTANT NOTICE
> Additional Information
>
> Thank you for your business and continued trust in State Farm®. We look forward to continuing our relationship with you.
>
> Based on your recent roof claim, we have updated your roof age. This update may affect your premium.
>
> If your roof was replaced with a qualifying impact resistant roofing product, you may be eligible for a premium discount.
>
> Please contact your agent to confirm the characteristics of your home and complete a current replacement cost estimate.
>
> It's important to regularly review your State Farm policy to make sure your coverages meet your needs. One important consideration is the comparison of your Coverage A limit to the current estimated replacement cost of your dwelling. If you've remodeled or made any other changes to your dwelling since you purchased your policy that might increase the replacement cost, it's important to update your coverage to reflect these changes. We recommend you select a coverage amount that is at least equal to 100 percent of your estimated replacement cost, but the choice is yours.
>
> State Farm does not guarantee that any type of estimate will represent the actual cost to rebuild your dwelling after a loss.

[7]

Thus, State Farm's downplaying of agent underwriting responsibilities is a smokescreen.

## II. PARTIES

5. **Plaintiff Christina Merrell** ("Plaintiff") owns the Insured Property in Wagoner County, Oklahoma. Plaintiff entered into a contract of insurance with State Farm to provide replacement cost coverage for the Insured Property, dwelling insurance policy no. 36-CK-S656-0 (the "Policy") through Agent's offices. The Policy was in force and

---

[7] August 5, 2025 Notice to State Farm insured DKD Properties, LLC ("**Please contact your agent to confirm the characteristics of your home and complete a current replacement cost estimate**.") (emphasis added).

effect at the time of the loss in question. The Insured Property was damaged on October 4, 2023. Plaintiff timely filed a claim for indemnity under the Policy for damage to the Insured Property (the "Claim," No. 36-72Q6-32K).

6. **Defendant State Farm Fire and Casualty Company** ("State Farm") is a foreign insurer licensed to do business in the State of Oklahoma. State Farm may be found and served via its statutory service agent the Oklahoma Insurance Department in Oklahoma County, Oklahoma.

7. **Defendant Jason Strickland** ("Agent") owns and operates a captive State Farm agency in Tulsa County, Oklahoma. Agent was at all relevant times an agent and/or ostensible agent of Defendant State Farm. Agent may be served with process through the primary business location at 4008 S. Elm Place, Ste. E, Broken Arrow, OK 74011.

8. Agent is a properly joined defendant to this action, as held in ***thirty-seven*** remanded cases against State Farm alleging substantially the same claims and/or Scheme—most recently, *see, e.g.*, *Willard v. State Farm Fire & Cas. Co.*, 2025 WL 2419274 (W.D. Okla. Aug. 21, 2025) (Palk, D.J.) (order consolidating eleven cases, granting each motion to remand, and directing that each case be remanded to the appropriate State of Oklahoma district court); *Maher v. State Farm Fire and Cas. Co. & Terry M. Amacher*, 2025 WL 1909507 (W.D. Okla. July 10, 2025) (Wyrick, D.J.); *Adair v. State Farm Fire & Cas. Co. & Tim Custer Insurance Agency, Inc.*, 2025 WL 1263128, at *1 (W.D. Okla. May 1, 2025) (Dishman, D.J.); *Pruitt v. State Farm Fire & Cas. Co.*, 2025 WL 1030353 (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.). As Agent is a citizen of the forum-state, removal of this action by any Defendant would be improper.

9. Venue is proper pursuant to 12 O.S. § 137.

## III. FACTUAL BACKGROUND

10. Through State Farm's Wind/Hail Focus Initiative, State Farm's Property and Casualty Claims Division/Department ("P&CCD") established State Farm's corporate goal of reducing its indemnity payments by denying full roof replacements to policyholders like the Plaintiff on valid wind and hail claims. Consequently, State Farm preordained the denial of its insureds' valid claims for wind- and hailstorm damage. This decision reflects simple greed: maximizing profits for State Farm at the expense of its insureds.

a. To achieve this end, State Farm assembled its Wind-Hail Model Enhancement Team ("WHMET") under the leadership of Nichole Manduca to knowingly developed and implemented its enterprise-wide, pervasive, and systematic Scheme. In fact, Manduca's Linked-in profile boasts her achievement in reducing State Farm's spend on total roof replacements by "over 50%.":

> **Nicole Manduca, ChFC** She/Her · 3rd
> Senior Leader / Director of P&C Operations, Insurance & Financial Services: Transformational Leader | Operations Excellence | Change Leadership | Innovation | Diversity-Equity-Inclusion | Executive Catastrophe Response

> Achievements:
>
> - Led enterprise effort in Fortune 50 company improving quality results by over 50% and significant reduction in operational expenses over 12 months

[8]

This specifically refers to Manduca's work on State Farm's WHMET at the expense of policyholders like Plaintiff.

11. State Farm launched the Scheme with a test run in Texas and then continued to other hail-prone states like Oklahoma. State Farm implements the Scheme throughout Oklahoma using a variety of bad faith tactics and employees at every level of State Farm. State Farm captive agents anchor the Scheme on the front end of the transaction. State Farm reinforces the role of its captive agents (like Agent) through training, compensation, and other incentives. State Farm then utilizes biased third-party adjusters and/or engineers, who further the Scheme by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims. State Farm weaponizes these various undisclosed tactics against first-party insureds like Plaintiff. State Farm implements a series of rules (e.g., program and personal rules) in its Xactware software platforms that limit its adjusters' ability to pay roof claims without approval. This allows State Farm team managers to override adjusters' decisions to pay roof claims and then penalize or retrain them for failing to implement the Scheme. At all times, State Farm tracks in detail the impact of the Scheme—its reduction in State Farm's indemnity losses on roofs by state and region, as well as its return on investment derived from the training and other tactics

[8] Linked-In Profile for Nicole Manduca, available at https://www.linkedin.com/in/nicolemanduca/ (last visited Sept. 24, 2025).

involved. This includes its ratios of replacement, repair, and other roof responses, as well as the financial impact thereof.

12. This case exemplifies the Scheme in action. State Farm's treatment of Plaintiff and the Claim demonstrates each step in the Scheme leading to State Farm's intended outcome.

**A. State Farm's Captive Agents Anchor the Scheme.**

13. In each instance, State Farm's Scheme begins with its captive agents (including Agent)—State Farm's frontline underwriting employees—who market, sell, procure, and bind (whether at inception and/or renewal) State Farm homeowners' insurance full replacement cost coverage to the insured.

**1. State Farm Agent's Duties in Procuring Full Replacement Cost Coverage.**

14. State Farm captive agents market, sell, procure, and bind (at inception and/or renewal) what they tout as ***full replacement cost*** homeowners insurance coverage to prospective insureds. State Farm uses the same insurance policy to issue full replacement cost homeowners coverage in Oklahoma—while the amount of full replacement cost coverage (and premiums charged therefore) differ from insured to insured, the scope of full replacement cost coverage is in large part materially the same for all insureds State Farm subjects to the Scheme.

15. State Farm considers its agents (like Agent) to be the first line of its underwriting division and, thereby, arbitrators of its underwriting guidelines, criteria, and rules vis-à-vis whether a property qualifies for coverage bound. State Farm's captive agents

(like Agent) therefore play a crucial role in the Scheme by and through the marketing, procurement, sale, and binding of State Farm's insurance products to the insured with the warrantee that the property in question fully meets State Farm's underwriting requirements. This role creates key legal duties, which State Farm's Agent owes to the insured:[9]

a. State Farm's agents must use **reasonable care, skill, and diligence** to procure full replacement cost coverage as the insured requested that meets the insured's stated needs (*see* Note 12, *infra*);

b. State Farm's agents who undertake the calculation of replacement cost for the insured must use reasonable care, skill, and diligence to do so;

c. When State Farm's agents speak, they owe a duty to do so accurately and truthfully; and

d. State Farm agents have a duty to speak and to fully disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external complaints about State Farm's handling of wind and hailstorm

[9] Under Oklahoma law, a duty to speak may arise from a partial disclosure. *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) (the law imposes a duty to speak from a partial disclosure because "the speaker is under a duty to say nothing or to tell the whole truth" (citation and internal quotation marks omitted)); *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350,1353-54 (Okla. 1988) ("Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth."); *see also Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.).

claims, and other material information any insured would deem reasonable in making a purchasing decision.

16. Industry standards, as well as agents' legal duty of reasonable skill, care, and diligence in the procurement of insurance, require State Farm's agents to act in accordance with the training and contractual requirements State Farm imposes upon them. These requirements (and State Farm's required training that reinforces those requirements at the agent level) supposedly exist to ensure policyholders receive the full replacement cost coverage they request. They further exist to ensure State Farm's captive agents bind full replacement cost coverage in accordance with their representations to the insured, and to make sure the agent's actions to sell and bind coverage comport with State Farm's internal underwriting guidelines, criteria, and rules.

17. Agent markets as much on Agent's website:

> **ABOUT ME**
>
> Hello, my name is Jason Strickland. I grew up in Broken Arrow, OK, and have raised my family here after college. In college I studied Business Management and Marketing and received my B.A. degree from Northeastern State University. I have over 25 years of insurance and financial services experience and I look forward to helping my Good Neighbors with their needs. My passion is to help people understand the gaps in their coverage and help them protect what is most important to them and their family. Outside of insurance I enjoy serving at our local church, playing golf, & enjoying all that Broken Arrow has to offer. Stop by our local State Farm office today for a free, no-obligation insurance quote!
>
> My State Farm Insurance team and I have over 100 years of combined insurance experience. Whether you are local here in Broken Arrow, or located anywhere across the State of Oklahoma, I am here to help! Over the years, I have gotten to know so many other Good Neighbors from Tulsa, Bixby, Oklahoma City, Coweta & Owasso. Whether you're considering on purchasing a new car or are getting your first set of wheels, our State Farm office is here to guide you through choosing the right Auto Insurance for your needs. If you're considering on purchasing a new home and need Homeowners Insurance or need to protect your stuff in your new apartment with Renters Insurance, we're here for you every step of the way. Let's take an opportunity to create your very own Personal Price Plan that fits your needs and fits your budget! As a fellow small business owner, I understand the challenge of running a successful business. There are many moving parts! I would love an opportunity to discuss your current Business Insurance and Commercial Auto Insurance and see if we can provide some additional value to your business.

[10]

Statements such as these, especially given Oklahoma's extreme weather and frequent hailstorms, further invokes the insured's (Plaintiff here) reliance on Agent's insurance expertise, superior knowledge, and assurances regarding State Farm homeowners insurance products and coverage.

18. State Farm agents ***should*** meet these duties by verifying the condition of the property to be insured and comparing that to State Farm's underwriting guidelines, criteria, and rules. The most logical way to do so would be an in-person inspection of the Insured Property prior to the inception of full replacement cost coverage and routinely thereafter to verify the condition and attributes of the Insured Property for the purposes of (a) the agent's accurate calculation of replacement cost and (b) the agent's accurate representation that the Insured Property qualifies for full replacement cost coverage under State Farm's

---

[10] https://www.insureba.com/?cmpid=sq9x_blm_0001 (last visited October 1, 2025).

guidelines. Since each renewal is a new sale and contract, State Farm captive agents should maintain a baseline of the property's condition throughout the insurance relationship with the insured. Indeed, not all homes automatically qualify for State Farm's homeowners policies (according to State Farm underwriting rules)—only those which meet those internal underwriting rules constitute a "good risk" for State Farm to insure. It is the State Farm captive agent—and, in this specific instance, Agent—who confirms whether these rules are met with regard to a specifically-insured property (like Plaintiff's Insured Property).

19. The policy is a contract—one that obligates State Farm to indemnify its insured upon the occurrence of a covered loss. State Farm's issuance of a policy rests on the agent's certification of the property's qualifications under State Farm underwriting guidelines, criteria, and rules—a critical representation to both State Farm and the insured: namely, that the property identified in the policy declarations meets the criteria for the full replacement cost coverage prescribed at the time of inception or renewal for which the agent is responsible.[11] Consequently, ***Agent was responsible for these representations in this case.*** State Farm's captive agent further represents, at the very least impliedly through the act of selling, procuring, and binding full replacement cost coverage (and, in certain instances, expressly) and/or inherently represents that no condition, pre-existing damage, deterioration, wear-and-tear, or other defect will operate to negate the property's eligibility

[11] This must be true, for the issuance of full replacement cost coverage upon a property that does not qualify at the time would constitute an illusory full replacement cost coverage violation, as well as a violation of State Farm's own underwriting rules.

for full replacement cost coverage under the policy in the event of a loss. Agent acted accordingly here.

20. Most captive State Farm agents (including Agent) have binding authority. That means they instruct State Farm to issue full replacement cost coverage to the insured without State Farm's prior approval. By virtue of the act of doing so, the agent certifies and represents to both State Farm and the insured that the property meets State Farm's underwriting rules and criteria and is therefore eligible for full replacement cost coverage. This representation is repeated each time the policy renews, such that the agent represents the property's eligibility (and, thereby, the absence of any condition that would negate that eligibility), each policy year upon renewal. This representation was repeated accordingly in this instance by Agent to Plaintiff (and, thereby, State Farm).

21. State Farm's agents must use reasonable care, skill, and diligence in making this representation. This would necessarily require an inspection of an insured property to determine this eligibility for full replacement cost coverage under State Farm's internal underwriting requirements. There is no other way for the agent to gather the information it needs to accurately relay to State Farm (and the insured) whether the property rightfully meets State Farm's underwriting criteria for full replacement cost coverage. Thus, there is no other way for State Farm captive agents (like Agent) to meet their duties they owe their insureds (like Plaintiff).

22. If State Farm's captive agent were to find the property fails to quality for full replacement cost coverage (as defined by State Farm's underwriting rules) at any point in the insurance relationship (*e.g.*, the roof is too old, too worn, in poor condition, or otherwise

affected by pre-existing damage), the State Farm agent owes an independent duty to report the same to both the insured and to State Farm. This should result in reduction, denial, or cancellation of the insured's full replacement cost coverage and impact the nature of "100% insurance to value" vis-à-vis the insured property. Of course, this determination would likely first require the State Farm agent's physical inspection of the roof, which practically never occurs. On information and belief, no such inspection of Plaintiff's home occurred here.

23. Ultimately, and as here, State Farm's agent markets, sells, procures, and binds full replacement cost coverage for the property on behalf of State Farm. State Farm then issues a resultant homeowners insurance policy upon the agent's certification that all binding and underwriting guidelines, rules, and criteria are met. Remarkably, State Farm's agents almost never take the steps necessary to verify with reasonable care, skill, and diligence the accuracy of this representation. This means they represent the property's eligibility under State Farm's underwriting rules to both State Farm and the insured recklessly and blindly, without ever verifying whether that representation is true, in almost every instance of the Scheme. ***On information and belief, Agent took no reasonable care, skill, or diligence to verify the accuracy of Agent's representation that the property fully qualified for State Farm full replacement cost coverage at 100% insurance to value.***

24. This consistent, blind misrepresentation is a necessary furtherance of the Scheme in each instance (including Plaintiff's case). State Farm provides training to its captive agents in accordance with the Scheme, and each State Farm captive agent relies on this uniform training to make the same or similar representations that each Insured Property

is eligible for the full replacement cost coverage sought under the same State Farm underwriting rules. This uniformity allows State Farm to effectuate its Scheme with consistency and makes Plaintiff's case an exemplary instance of the Scheme.

**2. Agent's Treatment Exemplifies the Scheme.**

25. Agent's treatment of Plaintiff exemplifies the Scheme and shows it in action:

a. Plaintiff contacted Agent to procure homeowners insurance from State Farm. Plaintiff specifically requested Agent obtain a replacement cost policy that would provide ***full replacement cost coverage***[12] for the Insured Property in the event of a loss.

b. To that end, Plaintiff expressly and/or inherently disclosed concerns and insurance needs to Agent. Above all, given Oklahoma's extreme weather, Agent is aware that the Plaintiff required full replacement cost coverage under a policy that would fully replace the Insured Property's roof in the event of a tornado, windstorm, and/or hailstorm loss, without exclusion of any weather-related losses.

c. By virtue of the act of marketing, selling, procuring, and binding full replacement cost coverage under the Policy (whether at inception or renewal, and without any limitation for wind- or hailstorm damage), Agent independently established, calculated, and set the Policy's replacement cost value and resultant

[12] *See Rains v. CSAA Fire & Cas. Ins. Co.*, 2020 WL 6729085, at *6 (N.D. Okla. Nov. 16, 2020) ("Unlike requests for "full" or "adequate" coverage, a specific request for "replacement" coverage, could qualify as a "need[ ] ... disclosed by the insureds" that would trigger an agent's duty to provide such coverage if promised. *Rotan*, 83 P.3d at 895. The term "replacement coverage" is a term that connotes a specific type of coverage.").

policy full replacement cost coverage limits. Neither Agent nor State Farm required or otherwise asked Plaintiff to calculate or request a specific amount of full replacement cost coverage for the Insured Property. Instead, Agent took on that responsibility and thereby incurred the duty to do so accurately and with the requisite skill, knowledge, and expertise. Given Agent's touted expertise, the only way it could have possibly done so, in a manner commensurate with its duties, is by means of an inspection of the home to ascertain its condition and qualities.

d. By virtue of the act of marketing, selling, procuring, and binding full replacement cost coverage under the Policy and binding full replacement cost coverage (without limitation), Agent independently selected and calculated full replacement cost coverage and expressly and/or inherently conveyed that such full replacement cost coverage limit was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Property's insurance to value. Agent thereby inherently represented to Plaintiff that the property met State Farm's underwriting guidelines and qualified for the full replacement cost coverage Agent bound.

e. Both Agent and State Farm thereby either knew or should have known of any material defect, pre-existing damage, or other condition(s) that would exclude the Insured Property from full replacement cost coverage in violation of State Farm's underwriting guidelines, rules, and criteria.

f. Both Agent and State Farm knew State Farm purposefully uses hidden definitions of wind- and/or hailstorm damage to deny claims, along with other bad

faith tactics described herein, but failed to disclose these to insureds in the Policy or at any point prior to claims adjustment.

26. In furtherance of the Scheme, Agent committed the following strategic and material ***omissions***:

a. On information and belief, neither Agent nor State Farm took reasonable care, skill, or diligence to verify the condition of the Insured Property (*e.g.*, by means of an inspection or otherwise).

b. On information and belief, neither Agent nor State Farm ever verified the Insured Property's condition, characteristics, attributes, etc.—whether at Policy inception or upon each subsequent annual renewal of the Policy.

c. Regardless of whether an inspection occurred, neither Agent nor State Farm ever disclosed to Plaintiff that the Insured Property was ineligible under State Farm's underwriting guidelines for the requested full replacement cost coverage for any reason.

d. Regardless of whether an inspection occurred, neither Agent nor State Farm took reasonable care, skill, and diligence in maintaining a current understanding of the Insured Property's condition throughout the course of renewal.

e. Neither Agent nor State Farm ever advised Plaintiff that the Insured Property had any defect, pre-existing damage, or other conditions that would exclude it under State Farm's underwriting rules from full replacement cost

coverage.[13] Critically, such a defect was the basis for State Farm's denial of coverage.

f. Neither Agent nor State Farm ever advised Plaintiff of State Farm's Scheme, including but not limited to State Farm's internal and clandestine definitions of "hail damage," "wear and tear," "granular loss," "functional damage," etc.

g. Neither Agent nor State Farm required or otherwise asked Plaintiff to calculate or request a specific amount of full replacement cost coverage for the Insured Property—rather, Agent assumed this duty and thereby assumed the duty to do so accurately, with requisite skill, knowledge, and expertise, and in a way commensurate with his duties. These obligations necessitated a physical inspection of the Insured Property, which would have disclosed any defect, pre-existing damage, or full replacement cost coverage-negating condition.

h. Neither Agent nor State Farm disclosed to Plaintiff that the value Agent calculated for the Insured Property and resultant full replacement cost coverage limits did not in fact represent 100% insurance to value because State Farm had already pre-ordained the denial of any claim for roof damage.

i. Neither Agent nor State Farm disclosed to Plaintiff the existence of the Scheme, the Wind/Hail Focus Initiative, or any aspects thereof.

---

[13] As explained above, had Agent identified any such condition, Agent would have been required to report the same to both Plaintiff and State Farm and adjust full replacement cost coverage accordingly.

27. Nevertheless, and under the cover of Agent's strategic and material omissions, Agent marketed, sold, procured, and bound full replacement cost coverage without limitation. State Farm issued the Policy. Agent, by virtue of these acts, represented that Plaintiff were covered under the Policy for all fortuitous losses, including all weather-related damage.

28. Given Agent's purported expertise and specialized knowledge of insurance policies, Plaintiff reasonably relied on Agent for the same.

**B. State Farm Uses a Standardized Policy to Perpetuate the Scheme.**

29. State Farm uses the same replacement cost policy to issue homeowners insurance full replacement cost coverage throughout Oklahoma.[14] State Farm's policy is integral to the Scheme: the criteria, limitations, exclusions, and other tactics State Farm employs in adjusting windstorm, hailstorm, and tornado claims, which are at issue in this case, are wholly absent from the four corners of State Farm's policy. This is true for each Scheme victim—in no instance does State Farm disclose these hidden tactics in a policy to an insured.

30. State Farm and its captive agents (like Agent) represent the policy to be a

---

[14] This Petition does not allege that the *terms* of State Farm's policy or the rates State Farm charges therefore are unlawful. Plaintiff does not invoke (and further disclaim) any invocation of the filed-rate doctrine. Rather, the Petition alleges conduct on State Farm's part (as well as that of Agent) that does not square with the four corners of State Farm's policy—that Defendants use hidden and undisclosed claims handling criteria, limitations, exclusions, and other tactics that are wholly absent from the terms of the policy. This renders Defendants' ***conduct*** unlawful. Therefore, any argument that this Petition invokes the primary jurisdiction of the Oklahoma Department of Insurance, or the Commissioner, is a misled end-run around bad faith jurisprudence and tort law in Oklahoma.

replacement cost policy. The full replacement cost coverage limit for the property insured under the policy is keyed to its replacement cost value, such that the policy should afford an amount of full replacement cost coverage that represents (at least) the full amount needed to replace the Insured Property in the event of a loss. State Farm, through its captive agents (like Agent), voluntarily assumes the responsibility of calculating both the replacement cost value and the resultant full replacement cost coverage limit for the insured.

31. State Farm's replacement cost policy functions like an "all risk" policy: that is, if the policy does not expressly exclude a loss, then the policy should afford full replacement cost coverage for the loss pursuant to the loss clause. Thus, State Farm's policy affords full replacement cost coverage for the property in question for damage resulting from hail because hail damage is not expressly excluded from full replacement cost coverage. The policy speaks only to "accidental direct physical loss" therefrom, with no other limitation or definition disclosed.

> **COVERAGE A – DWELLING**
>
> ***We*** will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy. However, loss does not include and ***we*** will not pay for, any ***diminution in value***.

32. The policy does not define, limit, or otherwise mitigate full replacement cost coverage for tornado, wind- and/or hail-storm damage outside of "accidental direct physical loss" therefrom. The policy does not provide any limitations on how or when such full replacement cost coverage will apply to a roof. It does not specify, condition, define,

or limit that full replacement cost coverage in any way, *e.g.*, minimum windspeeds, the type of roof damage, a minimum number of hail strikes per square foot, a minimum size of hail, etc. Rather, all of these ***very real*** limitations exist in State Farm claims handling procedures, which lie obscured beyond the view and understanding of the insured until the insured files a claim and confronts the Scheme.

33. On its face, State Farm's policy merely purports to provide the insured the broadest form of full replacement cost coverage available today. State Farm's policy cover page (and, therefore, Plaintiff's Policy's cover page) states as follows:


StateFarm

This policy is one of the broadest forms available today, and provides you with outstanding value for your insurance dollars. However, we want to point out that every policy contains limitations and exclusions. Please read your policy carefully, especially "Losses Not Insured" and all exclusions.

State Farm®
**Homeowners**
**Policy**

**C. State Farm Employs an Array of Bad Fath Claims Handling Tactics to Perpetuate the Scheme.**

34. State Farm's Scheme then turns on a series of bad-faith claims handling tactics, which help State Farm justify its denial of valid claims. These tactics, along with State Farm's agent's complicity (described above), are all part of State Farm's Wind/Hail Focus Initiative—an enterprise-wide program State Farm implemented through its property and casualty claims department to reduce its indemnity losses related to roof damage from wind, hail, and tornado. The Wind/Hail Focus Initiative included an array of

claims handling practices that are wholly absent from the policy and any disclosures made to the insured (until, of course, State Farm ambushes the insured with a denial). These practices include, but are not limited to, the following:

35. **State Farm employs a narrow and limited definition (as well as restrictive claims handling protocols) for hail damage.** This allows State Farm adjusters to deny claims even when their loss inspection clearly shows hail damage to the insured roof. State Farm's narrow and limited definition is absent from the four corners of the policy and hidden from the insured until State Farm uses it to deny a valid claim. State Farm's captive agents (including Agent here) are fully aware of the narrow and limited definition, this critical disclosure is concealed, and State Farm's insureds are wholly unaware of full replacement cost coverage limitation until they suffer a loss, file a claim, and receive a denial. It is only when the insured becomes the latest victim of State Farm's Scheme that the insured learns of State Farm's internal limitations to its full replacement cost coverage regarding hail damage. This is precisely what happened to Plaintiff.

36. **State Farm's adjusters misattribute damage to non-covered causes of loss.** State Farm's adjusters find damage to the insured property but attribute that damage to a non-covered cause of loss—most commonly, "wear and tear," "pre-existing damage," or "manufacturer defect." With regard to roof shingles, State Farm often misclassifies shingle damage as "granular loss." This finding flies in the face of Defendants' representations and/or material omissions, which are inherent to the act of procuring, binding, and renewing full replacement cost coverage. In many instances, this is stated plainly on State Farm's denial letter. In other instances, the adjuster simply fails to

acknowledge the damage at all. Yet there is, indeed, patent wind- and/or hailstorm damage, such that the insured was compelled to file the claim. The adjuster simply fails to record it as a covered cause of loss—thereby implying that the damage was caused by some other, non-covered cause. Critically, Defendants expressly and/or impliedly represent that the Insured Property qualifies for the full replacement cost coverage bound by virtue of the act of binding the full replacement cost coverage. Thus, if the roof suffered from a manufacturer defect, pre-existing damage, or substantial wear and tear, the roof may not qualify for full replacement cost coverage (whether at inception or annual renewal). This should be detected by the Agent's inspection and inform some change in full replacement cost coverage. These defects cannot accrue or appear by fiat in the mere months between the most recent policy renewal and the date of loss. It is, at best, duplicitous for Defendants to, on one hand, tell the insured that the property fully qualifies under State Farm's underwriting rules for the full replacement cost coverage bound and then, with the other, tell the insured that it in fact did not. This is exemplary ambush claims-handling and *prima facie* bad faith.

37. **State Farm adjusters misstate the date of loss.** If the insured is unable to pinpoint the exact date of loss, State Farm's adjuster uses the opportunity to further the Scheme and justify State Farm's pre-ordained denial of the claim. In these instances, State Farm adjusters review the Accuweather data and *choose* a date of loss that either (a) falls outside its hidden one-year limitation or (b) shows insufficient hail occurred to constitute a covered claim under its clandestine rules. If the insured pinpoints a date certain for the

date of loss, State Farm may still use Accuweather to justify its wrongful denial of the insured's hail damage claim.

38. In addition, State Farm subjects its insureds to arbitrary limits on the time to file claims, manipulates damage findings to ensure losses fall under the policy deductible, and even employs its hand-chosen engineering firms (who are dependent on State Farm for business) to drum up sham reports that rubber-stamp its adjusters' misrepresentations.

39. Each of these aforementioned bad-faith claims handling tactics perpetuates the Scheme and allows State Farm to deny valid property insurance claims. State Farm trains its claims handling personnel to implement these tactics. State Farm trains its captive agents (like Agent) to market, sell, and bind full replacement cost coverage in a way that allows the Scheme to carry forward undetected.

**D. Defendants Subjected Plaintiff to the Scheme.**

40. The manner in which State Farm handled the Claim illustrates State Farm's Scheme and clearly demonstrates State Farm's bad faith:

a. On October 4, 2023, the Insured Property was struck by a strong wind and hailstorm that damaged homes throughout Wagoner, Tulsa County, and other parts of Oklahoma.[15] This storm caused extensive wind and hail damage to the roof, including hail impacts marked by chalk all over the roof shingles and soft metals, shingles torn from the roof, and interior water damage from the roof leaking:

[15] https://hailtrace.com/hail-maps/10-04-2023 (last visited October 2, 2025).









24







b. Plaintiff was home when the storm occurred and recalls the wind being so violent that water was coming through the windows and a tree in the front yard was bent over. This widespread wind and hail damage caused the roof to be a total loss.

c. Plaintiff properly submitted a Claim to State Farm for the storm damage through the State Farm Claim Hotline.

d. In responding to the Claim submission, State Farm deployed Seek Now to inspect Plaintiff's Insured Property on or about August 26, 2024. Seek Now is a biased, hired-gun third-party inspector that is often used by State Farm to rubber stamp its pre-determined denials of roof claims in furtherance of State Farm's Scheme, which is what occurred in Plaintiff's instance. In accordance with State Farm's Wind/Hail Focus Initiative and resultant Scheme, Seek Now conducted an inadequate inspection of the Insured Property and was unwilling to consider the full extent of wind and hail damage that totaled the roof. Upon information and belief, Seek Now's inspector, Patrick Simmons, was inexperienced. Further, he did not inspect the interior of the house, although it was clear that the Insured Property sustained interior water damage from the roof leaking.

e. Simmons was not on the roof for long and his brief inspection only took about fifteen to twenty minutes total. Plaintiff's roofing contractor was present for Simmons' inspection and was surprised about how rushed his inspection was.

f. Plaintiff requested a reinspection by State Farm because of the inadequate and deficient initial inspection by Seek Now. State Farm subsequently dispatched one of its own adjusters, Khalid Fouda, to further inspect the damage to the Insured Property. In accordance with the Scheme, Fouda's inspection was also deficient because he refused to acknowledge patent wind and hail damage so that State Farm could avoid paying Plaintiff her full replacement cost benefits. As such,

Fouda intentionally limited the damage in his estimate to "***Pea size hail dents found to exterior gutters/downspout with no spatter***," and further noted that "***[h]ail not large to damage 30 years laminate shingles on the reported date of loss***." This arbitrary conclusion by Fouda is mandated by the Wind/Hail Focus Initiative, which weaponizes a limited and narrow definition of hail damage against insureds like Plaintiff here. *See* ¶ 35, *supra*. Plaintiff was not aware of this damage limitation because it is absent from the Policy and neither Agent nor State Farm disclosed this hail damage definition/limitation to Plaintiff at any time. *Id.*

g. Moreover, Fouda wrongfully and arbitrarily attributed hail damage to the shingles to "***[g]ranule loss, deterioration, wear and tear found to shingles of all slopes due to age and improper ventilation***," which is pre-existing damage that State Farm has a pattern and practice of wrongfully utilizing to ignore blatant wind and hail damage. *See* ¶ 36, *supra*.

h. Therefore, Fouda purposefully manipulated the estimate to ignore all hail damage to the roof shingles and to limit the damage to just the gutters and downspouts, only 4 wind damaged roof shingles, roof vent(s), and rain cap. Because Fouda intentionally limited the damage to mostly the roof's "soft metals," he was able to ensure the damage fell below the Policy deductible so that State Farm could deny the Claim without payment. Fouda also failed to inspect the interior water damage sustained from the October 4, 2023 storm.

i. State Farm and Fouda's bad faith tactics were pre-ordained by the Scheme. On September 4, 2024, State Farm issued a letter to Plaintiff denying the

Claim on the basis that the roof damage was the result of "***[w]ear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown***." As such, State Farm denied the Claim without payment as manifested by the Scheme.

j. State Farm also called Plaintiff and informed her it was standing on its findings because it claimed the hail damage was just wear and tear, despite clear evidence to the contrary.

k. At the time, Plaintiff was unaware of State Farm's bad faith pattern and practice of wrongfully attributing valid wind/hail damage to pre-existing damage to avoid paying for full replacement cost benefits, which is dictated by the Scheme. *See* ¶ 36, *supra*. Moreover, Plaintiff was never told by Agent or State Farm that her roof was too old, had granule loss/wear and tear/deterioration, or had other pre-existing damage and roof defects such as those listed by State Farm in both the estimates and denial letter as the basis for its wrongful denial.

l. In furtherance of the Scheme, Agent never inspected the Insured Property and otherwise failed to verify the condition of the Insured Property at any time, yet Agent sold and renewed full replacement cost coverage recklessly and blindly. *See* ¶¶ 22-23, *supra*. This signaled to Plaintiff that the Insured Property continually satisfied State Farm's underwriting guidelines and qualified for 100% full replacement cost coverage without any adjustments or depreciation for age, condition, etc. However, this turned out to be untrue once State Farm wrongfully denied Plaintiff's Claim based on pre-existing damage that negated Plaintiff's full

replacement cost coverage. Indeed, Agent failed to disclose to Plaintiff any roof defects and pre-existing damage (*i.e.*, "***[w]ear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown***") that would preclude full replacement cost coverage despite being required to in accordance with State Farm's underwriting guidelines.

m. Pre-existing damage to the roof should have been identified by Agent at Policy inception and renewals and disclosed to Plaintiff and State Farm as such that would disqualify Plaintiff from full replacement cost coverage. Instead, Agent failed to verify whether any roof defects or other pre-existing damage, such as ***wear, tear, age, deterioration, granule loss, inherent vice, latent defect, mechanical breakdown***, existed. Agent's failed underwriting duties and failure to disclose crucial information affecting the Insured Property's eligibility for replacement cost coverage allowed State Farm to ambush Plaintiff with a Claim denial based wholly on pre-existing damage. Thus, Plaintiff was subjected to the Wind/Hail Focus Initiative. *See* ¶¶ 4, 10, 13-28, 34-36, *supra.*

n. Plaintiff had hired a roofing contractor that wholly contradicted State Farm's blind ignorance to patent hail damage to the roof shingles. The roofing contractor observed comprehensive hail damage all over the roof shingles and prepared an estimate exceeding $18,000 for the cost to fully replace the totaled roof. Further, Plaintiff's roofing contractor submitted all of his damage findings and photograph report to State Farm as clear evidence of the roof's need for full replacement pursuant to the Policy.

o. Plaintiff's roofing contractor pointed out State Farm's failure to inspect the interior damage. Therefore, State Farm subsequently revised its estimate to include interior damage, but the result was the same: denial without payment because the damage was manipulated to fall below the Policy deductible.

p. Plaintiff's roofing contractor also spoke with Fouda to explain repairability issues with the roof. He advised Fouda that replacing individual shingles was not feasible because doing so would damage other shingles nearby. Hence, Plaintiff's roofing contractor further advised Fouda and State Farm of the need for a full roof replacement. Still, Fouda and State Farm were unwilling to listen.

q. To date, State Farm has wrongfully withheld the full replacement cost benefits Plaintiff is rightfully entitled to under the Policy. As such, Plaintiff has been unable to replace the roof and was forced to have her roofing contractor provide temporary repairs by tarping the roof to mitigate the damage and keep water from leaking into the home every time a storm passes. State Farm has left Plaintiff with no other option but to file a lawsuit in order to recover the full replacement cost benefits she is rightfully entitled to.

r. State Farm has established a pattern and practice of forcing insureds to file lawsuits to obtain their full replacement cost benefits, including but not limited to the payment for a full roof replacement. This is due to State Farm's cost-benefit analysis that led to its decision to create the Wind/Hail Focus Initiative and resultant Scheme. The Scheme is premised on the notion that most insureds will just

accept State Farm's bad faith investigation and evaluation of the claim and will not pursue a lawsuit because they are unaware of the Scheme. However, this is bad faith and any post-litigation claim payments should have been issued early on in the claim when it was evident that full roof replacement was required pursuant to the Policy.

s. Plaintiff's Claim was denied pursuant to the Scheme, which Plaintiff had no knowledge of and did not anticipate. Therefore, State Farm has withheld pertinent benefits, full replacement cost coverages, and other provisions due to Plaintiff under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16 and has wrongfully forced Plaintiff to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy. *See* 36 O.S. §1250.5(13) ("***Compelling, without just cause, policyholders to institute suits to recover amounts due under its insurance policies*** or insurance contracts ***by offering substantially less than the amounts ultimately recovered in suits brought by them***, when the policyholders have made claims for amounts reasonably similar to the amounts ultimately recovered.") (emphasis added).

## IV. FRAUDULENT CONCEALMENT

41. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

42. At all relevant times, Defendants concealed material facts about State Farm's Scheme from Plaintiff. This concealment protected and perpetuated the Scheme, such that

Plaintiff had no way of ascertaining the Scheme or the accrual of any cause of action against Defendants.

43. The Scheme is an artifice, which State Farm designed to be hidden from its insureds' discovery. To wit, the inherent nature of State Farm's "good neighbor" promises—the duty of good faith and fair dealing State Farm owes its insureds—makes the artifice appear reliable. Insureds of ordinary prudence have no means of discovering the Scheme or their right to pursue recovery under the law.

44. Defendants' fraudulent concealment tolls the running of any applicable statute of limitations.

## V. COUNTS

### COUNT I: BREACH OF CONTRACT
***Against Defendant State Farm***

45. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

46. Plaintiff entered into a contract of insurance (the "Policy") with State Farm to provide homeowner's insurance for the Insured Property. The Policy was in full force and effect at all material times hereto.

47. Plaintiff provided proper and timely notice to State Farm of the Claim for damage arising from wind and/or hail, which caused significant damage to the Insured Property.

48. The Policy full replacement cost coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and/or hail. The Policy language does not define, distinguish, or limit wind and/or hail damage in any fashion.

49. Plaintiff complied in all material ways with the terms and conditions of the Policy.

50. State Farm breached its contractual obligations under the terms and conditions of Policy by failing to pay Plaintiff all benefits owed under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of the Claim.

51. Consistent with State Farm's pervasive, state-wide fraudulent Scheme described in detail throughout this Petition, State Farm actively, intentionally, and fraudulently concealed its Scheme to deny and/or underpay valid hail damage claims from Plaintiff. This concealment is an inherent and important aspect of State Farm's Scheme; as State Farm knew its Scheme would work only if it was kept secret.

52. As a result of State Farm's breach of contract and other wrongful conduct, Plaintiff incurred damages.

**COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING ("Bad Faith")**
***Against Defendant State Farm***

53. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

54. At all relevant times hereto, State Farm owed Plaintiff a duty of good faith and fair dealing.

55. State Farm knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in at least the following acts and omissions:

a. knowingly engaging in a pattern and practice of

i. denial-oriented investigations and claims-handling practices;

ii. arbitrary and capricious claims handling;

iii. denying and or underpaying indemnity payments owed to its first-party insureds on valid hail claims, including Plaintiff;

iv. withholding pertinent benefits, full replacement cost coverages, and other provisions due to Plaintiff under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

v. limiting and/or denying rights inherent to Plaintiff;

vi. recklessly disregarding said rights;

vii. forcing Plaintiff to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy;

viii. manipulating claims to ensure damages fall below the policy deductible;

ix. ignoring covered hail and windstorm damage;

x. engaging in the pattern and practice of denying full roof replacement claims by asserting pre-existing damages and faulty installation without a pre-inception property inspection

and/or without reasonably updated knowledge of the pre-loss condition of the subject property;

xi. implementing the Wind/Hail Focus Initiative with the goal of reducing indemnity payments and deny full roof replacements to policyholders like the Plaintiff on valid wind and hail claims;

xii. utilizing biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims;

b. knowingly and purposely failing to

i. inspect the Insured Property prior to inception of the full replacement cost coverage and/or maintain current information as to the condition of the Insured Property prior to the loss;

ii. notify Plaintiff, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit full replacement cost coverage;

iii. communicate all full replacement cost coverages and benefits applicable to the Claim;

iv. perform a proper, timely, fair, and objective investigation of the Claim;

v. pay the full and fair amount for the hail damage sustained to the Insured Property in accordance with the Policy's terms and conditions;

vi. base its denial of the Claim on a valid, accurate, and reasonable grounds;

vii. disclose the Scheme to Plaintiff; and

viii. disclose State Farm's lack of compliance with its own underwriting guidelines, policies, and procedures in denying full replacement cost coverage to Plaintiff.

56. State Farm's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance contract between the parties. State Farm has no reasonable basis in its refusal to recognize and pay Plaintiff the agreed replacement cost as per the Policy for damages caused by the wind and hail damage to the Insured Property.

57. As a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiff sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure.

58. State Farm's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others. State Farm's actions during the handling of the Claims demonstrate it acted intentionally, and with malice and, breached its duty to deal fairly and in good faith. State Farm's actions were consistent with an overall collective corporate goal

of decreasing indemnity losses and thereby increasing profits through the systematic underpayment and denial of claims. The Scheme is sufficiently egregious in nature so as to warrant the imposition of punitive damages. State Farm's Scheme demonstrates an enterprise-wide "pattern" theory of bad-faith conduct, liability for which is cognizable under Oklahoma law. *See* 12 Okla. Stat. § 2406; *Vining v. Enter. Fin. Group*, 148 F.3d 1206, 1218 (10th Cir. 1998) (where plaintiff sought to prove insured's pattern and practice of bad faith conduct, evidence regarding other insureds was relevant to show defendant "acted in this case under Federal Rule of Evidence 406 (habit)"); *see also Metzger v. Am. Fid. Assur. Co.*, 2007 WL 4342082, at *1 (W.D. Okla. Dec. 7, 2007); *Markham v. National States Ins. Co.*, 122 Fed. Appx. 392 (10th Cir. 2004) (evidence of nation-wide rescission practice supported bad faith); *Barnes v. Okla. Farm Bur. Mut. Ins. Co.*, 2000 OK 55, 11 P.3d 162, 170 ("*insurer's unreasonable treatment of Barnes was not an isolated incident, but the same or similar tactic was used by insurer repeatedly with other insureds*"; awarding actual and punitive damages); *Copeland v. Tela Corp.*, 2003 OK CIV APP 98, ¶ 3, 79 P.3d 1128 (confirming no abuse of discretion in allowing evidence of habit evidence under 12 O.S. § 2406 to show pattern and practice conduct.); *Jones v. Farmers Ins. Co., Inc.,* 2012 WL 12863976 (W.D. Okla) (court holds that similar claims are relevant to Plaintiff's contract claim and the claim of bad faith in that they may show a pattern and practice).

59. State Farm enjoyed increased financial benefits and ill-gotten gains as a direct result of the wrongful conduct described above herein, which resulted in the injury to Plaintiff.

## COUNT III: NEGLIGENT PROCUREMENT OF INSURANCE
*Against Agent*

60. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

61. At all material times hereto, Agent acted as State Farm's agent and/or employee. State Farm is thereby vicariously liable for the Agent's conduct.

62. In procuring the Policy, Agent had a duty to

a. use reasonable care, skill, and diligence to procure full replacement cost coverage as the insured requested that meets the insured's stated needs;

b. use reasonable care, skill, and diligence in undertaking the calculation of replacement cost for the insured;

c. speak accurately and truthfully by informing Plaintiff of all full replacement cost coverages, advising Plaintiff of the benefits, risks, limitations and exclusions thereof, and perform a reasonable inspection of the Insured Property prior to procuring the full replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required; and

d. Disclose all material facts with respect to the Scheme as outlined within this Petition.

63. Agent breached Agent's duty owed to Plaintiff by:

a. Knowingly and purposefully procuring and renewing

i. illusory full replacement cost coverage (in that all fortuitous losses are not covered under the Policy);

ii. full replacement cost coverage deviating substantially and materially from that which Plaintiff requested;

iii. a Policy that did not accurately reflect the replacement cost of the Insured Property (*i.e.*, an amount that was 100% insurance to value as represented);

iv. a Policy that, as written, did not provide full replacement cost coverage to fully restore the Insured Property back to its pre-loss condition;

b. Failing to

i. follow and abide by State Farm's underwriting policies/guidelines;

ii. perform all necessary inspections of the Insured Property;

iii. confirm the accuracy of the pre-filled information provided by State Farm's replacement cost estimating tool;

iv. disclose pre-existing damage to the Insured Property;

v. verify whether its inherent representation to State Farm and Plaintiff that the Insured Property (including the roof) was in good condition was accurate;

vi. procure and renew a policy that provided the requested full replacement cost coverage for all fortuitous losses; and

vii. disclose all material facts of the Scheme as outlined within this Petition.

64. Plaintiff relied on Agent's representations to substantial detriment.

65. As a result of Defendants' conduct, Plaintiff sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

66. Defendants' conduct was intentional, willful, malicious and in reckless disregard of the rights of others and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. Defendants acted intentionally, and with malice and, breached duties owed to Plaintiff. Defendants' actions were consistent with their overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims.

**COUNT IV: CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION**
***Against All Defendants***

67. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

68. Defendants owed Plaintiff a legal and/or equitable duty to disclose all material facts that may arise out of their relationship as insurer and insured. *Croslin v. Enerlex, Inc.*, 2013 OK 34, ¶17, 308 P.3d 1041.

69. The concealment of a material fact which substantially affects another person constitutes fraud. *Patel v. OMH Medical Center, Inc.*, 1999 OK 33, ¶34; *Sutton v. David Stanley Chevrolet*, 2020 OK 87, ¶10, 475 P.3d 847. Fraudulent representations may consist

of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. *Sutton*, 475 P.3d at 15. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract **to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment**, the failure to speak constitutes fraud. *Id.* (citing *Croslin*, ¶17) (emphasis added).

70. "[A] variety of facts and circumstances [] will give rise to a duty to disclose material facts." The *Sutton* Court reiterated that it has "consistently found the existence of the requisite circumstances, *i.e.*, that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id.* at 15.

71. A negligent or innocent misrepresentation or concealment for constructive fraud occurs when one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Negligent misrepresentation can also be based on a material omission. *See, e.g., Lopez v. Rollins*, 2013 OK CIV APP 43, ¶12, 303 P.3d 911, 916; *Sutton*, 2020 OK 87, at ¶11; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, ¶34, 37 P.3d 783, 794; *Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983, 992 (10th Cir. 1994) (applying Oklahoma law).

72. Defendants owed specific duties to Plaintiff. These duties are encompassed in State Farm's duty of good faith and fair dealing owed to its insureds, as well as specific duties Agent owed Plaintiff—a duty to exercise reasonable diligence and skill in obtaining and accurately notifying of the nature and character of the insurance procured, the duty in undertaking the calculation of replacement cost for the insured to use reasonable care, skill, and diligence to do so, the duty to speak accurately and truthfully, and the duty to disclose all material facts relating to the Scheme as outlined within this Petition.

73. Defendants breached this duty by misrepresenting, concealing, or omitting pertinent material facts from Plaintiff, including (but not limited to) the following:

a. Defendants misrepresented the Insured Property met all underwriting requirements, that all property inspections had occurred, and that the replacement cost values Agent calculated were accurate and commensurate with reconstruction costs such that the full replacement cost coverage would fully restore, replace and/or repair the Insured Property (including its roof) in the event of a loss by a covered event.

b. Defendants misrepresented that the Insured Property (and, specifically, its roof) was eligible for the comprehensive full replacement cost coverage (rather than ACV).

c. Defendants failed to disclose that pre-existing issues with the Insured Property would either prevent issuance of the full replacement cost coverage or limit replacement cost coverage for any damage during the Policy period.

d. Agent misrepresented the procurement of the comprehensive full replacement cost coverage Plaintiff requested.

e. Defendants misrepresented that the Policy covered all fortuitous losses and that weather-related damage (even cosmetic)—big or small—was fully covered under the Policy.

f. Defendants failed to disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external complaints about State Farm's handling of wind and hailstorm claims, and other material information any insured would deem reasonable in making a purchasing decision.

g. Defendants failed to disclose to Plaintiff any of the above misrepresentations and/or omissions, any facts underlying these misrepresentations, or any material facts regarding the Scheme, including the Wind/Hail Focus Initiative, implemented with the goal of reducing indemnity payments to policyholders like the Plaintiff on valid wind and hail claims or State Farm's use of biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims.

74. Nevertheless, Defendants sold and renewed illusory full replacement cost coverage to Plaintiff knowing such statements were untrue.

75. As a result of both State Farm and Agent's breach of duty, each gained an advantage by misleading Plaintiff to substantial detriment and prejudice. These breaches

of duty induced Plaintiff to accept, purchase, and renew the State Farm replacement cost policy.

76. State Farm and Agent's misrepresentations constitute constructive fraud.

77. At all relevant times, Agent was State Farm's employee and/or agent.

78. As a result of the Defendants' constructive fraud, Plaintiff sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

79. Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of others, and/or was grossly negligent, and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, this Court should enter judgment on behalf of Plaintiff against all Defendants for:

(a) Monetary relief aggregating in excess of $250,000.00, excluding interest, statutory or punitive damages and penalties, and attorney fees and costs;

(b) Punitive damages under Oklahoma law;

(c) Disgorgement of the increased financial benefits derived by any and/or all of the Defendants as a direct result of the Defendants' wrongful conduct; and

(d) Prejudgment interests, costs and attorneys' fees.

Respectfully submitted,

Reggie Whitten
Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097

**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office: 405.516.7800
Facsimile: 405.516.7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
bsonne@whittenburragelaw.com
hwhitten@whittenburragelaw.com
jsanders@whittenburragelaw.com
jdenne@whittenburragelaw.com

-and-

George Gibbs, OBA #11843
2021 South Lewis Avenue, Suite 410
Tulsa, OK 74104
918-587-3939 Telephone
918-582-5504 Facsimile
Email: ggibbs@gablawyers.com

***Attorneys for Plaintiff***

***ATTORNEYS' LIEN CLAIMED***
***JURY TRIAL DEMANDED***